2023, 1880. Mr. Klorn, when you are ready. May it please the Court. I'd like to start first with the issue of definiteness. The existence of a trade secret is a question of fact, so is misappropriation. Definiteness is part of that factual inquiry. Every case that the parties have cited on definiteness is treated that way. So those cases all ask, well, first they apply a sufficiency of the evidence test, and the question they ask is, would a reasonable jury be able to conclude, based on the trial evidence, that there is the existence of a trade secret? So the controlling opinion on point here from the Sixth Circuit is the coddle seed opinion, and that's exactly what the Court did in coddle seed. So the first thing they do is they set out the Rule 50 standard as I've just articulated it. Then they say the main event here is definiteness. Then they set out the definiteness standard. They look at the evidence and ultimately conclude that there was sufficient evidence to support the jury's determination. So looking at the district court opinion and the record here, it seems to me there's a question of what the definition of the trade secret is and whether they're bound by their interrogatory answers. The district court said that it was a closed interrogatory answer. It couldn't be supplemented. In other words, that the trade secret was to be defined for purposes of trial by that interrogatory answer. I didn't see on appeal that you challenged that ruling so that we're in a situation where we have a definition of the trade secret and we have to decide whether that trade secret is defined in the interrogatory answers or trade secrets are not. Is that fair? Your Honor, so interrogatory two was a lit, so you're correct. The court did order a closed list. The court ordered two things, a closed list, and that's interrogatory two, but also interrogatory one to provide all of the information that was provided to Goodyear at the two meetings. So the two interrogatories work together. Okay, but do you agree then in terms of deciding what the trade secret is, we go with the interrogatory answers and we decide whether it was sufficiently definite, et cetera, et cetera, looking at the interrogatory answer? No, Your Honor. Part of it, no, Your Honor. We would look at the trial evidence. Well, that's my problem. Why do we look at the trial evidence when the district court said you have to go with the definition you provided in the interrogatory answer and you can't supplement it? Well, Your Honor, because there was a trial and none of the evidence was excluded. So once the evidence comes in, the jury considers that evidence. I don't think that's really responsive to my question. I mean, the judge says you've got to go with the interrogatory answers. You can't supplement. You're not challenging that ruling. So doesn't that mean that you're stuck with what you said in the interrogatory answer? Well, Your Honor, we are stuck with what we said. We're not disputing what we said in the interrogatory. But the issue of definiteness and whether there's sufficient evidence on the record is also informed by the testimony at trial, by the documents and other evidence at trial.  Let's just think for the moment we reject that. I'm sorry. Let's assume we reject that, that we say we have to go with the interrogatory answer. In terms of the interrogatory answer, let's take Trade Secret 24 as an example. Don't you lose on Trade Secret 24 if we go with the interrogatory answer since the patent application seemed to disclose what was described in the interrogatory answer? No, Your Honor. So I'd like to point the court to the fact that we're going to page 28 of our brief. Page 28 of our brief is the Goodyear Invention Disclosure Form. This is the Invention Disclosure Form from Dr. Benedict that he came up with at Goodyear about two weeks after meeting with Coda. Coda's claim has always been that what is located, what's identified on the Invention Disclosure as the new tube, that is what's close to and above the rim as described in Trade Secret 24. What is not is the prior art, which is in between the tire and the rim. And Mr. Proble testified consistently throughout the trial that Trade Secret 24 is close to and above the rim. What part of Trade Secret 24 is not disclosed by the 2007 PCT application? The part about being above the rim. So that's the key part. Well, two parts. One, in the sidewall and above the rim. And so the 2007 PCT, what it shows, it shows a pump tube. And this is shown on page, you can look at it, page 24 of our brief. And so this is direct from the 2007 PCT. Figure 2A shows a normal sidewall. And you can see there's space in between the tire sidewall and the rim. Figure 2B shows Mr. Proble's prior art invention, which he called a flat tube. And it's a tube that's inserted between the sidewall and the rim. And the tube is open like this. And when it goes in between the rim and the tire, it's sealed. And then there's a chamber that's left open, and that's what becomes the peristaltic pump. Counsel, I'd like to ask about damages. Is it correct that Goodyear made no product encompassing whatever you claim to be a trade secret and made no sales and no profit? And if so, how could there be damages for whatever occurred with what you claim to be a trade secret? So, Your Honor, you're correct. Goodyear did not – well, partially correct. So, Goodyear made thousands of tires and put them on the road and drove them millions of miles across the United States. And the Department of Energy said, you're good, you're golden, this product works, you can launch it. Goodyear didn't launch it. But not with your trade secrets or what you claim to be a trade secret. No, they did. So, Goodyear's self-inflating tire, Goodyear's self-inflating tire that has the optimal location for Mr. Proble, that tire was made, it was put on – they made thousands of them and they did fleet testing on trucking fleets for years to prove out the tire. And the Department of Energy gave that a green light. I thought what Judge Lori was saying is more accurate than what you're stating. I thought in at least the materials that I read, it indicated that nothing was actually commercialized in terms of that. So, it wasn't commercialized. So, this was testing that a tire has to go through before it goes into full commercial production. And Goodyear ultimately canceled the program. So, it is correct that Goodyear didn't make any significant amount of actual commercial sales. There were a few, but there was no – Or deprive you of commercial sales. Correct. What Goodyear did deprive COTA of is licensing revenue. So, COTA is a small startup company. It sells technology. And so, what COTA got deprived of was licensing revenue. Importantly – COTA didn't also have – COTA did not have a commercial product either, right? Well, that's correct. COTA did not have a commercial product. COTA was marketing what it called its flat tube, which is a device that can be added to a tire. And so, a lot of self-inflating tires in the road today, you can add a device on top of a normal tire. But I want to make one important point about trade secret law and royalty, how that works. So, the trade secret statute says, in lieu of actual damages, the jury can award a royalty. And what MidMichigan case, the Avery Dennison case, and the University Computing case all say is that it doesn't matter whether or not there's commercial success. The plaintiff fulfills its burden of proving damages by showing misappropriation in subsequent commercial use and introducing evidence by which the jury can value the rights the defendant has obtained. And so, the point of these cases that ultimately culminate in the Ohio standard jury instruction is that – Were the damages theories that were going to be pursued set forth in the pretrial order in this case? I'm sorry? Were the damages theories that were going to be pursued set forth in the pretrial order in this case? I don't think we had a pretrial order, but the damages theories for royalty were set forth in our interrogatory responses. And, in fact, the court denied a motion in limine. So, Goodyear moved to Daubert Cota's actual loss theory, and the court denied that. And Goodyear, at the same time, moved for a motion in limine against Cota's royalty theory, and the court denied that. And so, then, that was before trial. And then, at the end of – Why would you say it would be the best thing in the record that would have put the opposing party on notice that you were seeking reasonable royalty damages as opposed to actual damages? Three things, Your Honor. One, the statute itself, which says that in lieu of – if you can't prove actual loss, then the jury's allowed to award a reasonable royalty. The statute says that, but what did you communicate in terms of the damages theory you would pursue at trial? So, we had an interrogatory response, and I could direct the court to Goodyear's motion in limine on that issue, and Cota's response, and the court's ruling that Cota did provide evidence that the court denied the motion in limine that we're not allowed to put on a royalty case. And so, what I would also direct the court to is Cota's expert, Shirley Webster. Ms. Webster provided a reasonable royalty analysis, went through the whole Georgia-Pacific factors, and then what Ms. Webster said is that, of course – But the opposing counsel said that, at least in the briefing I was reviewing, that she refused, Dr. Webster refused, to actually put forth a reasonable royalty damages theory. Is that not accurate? That's not accurate, Your Honor. If you look back at the actual testimony, what they're citing is something that I said in the arguments on the motion in limine. And what I said is that Ms. Webster does, in fact, go through a royalty analysis. She applies the Georgia-Pacific factors and says, what would Goodyear have paid in terms of a license? What would Cota have accepted? But then she says, because Cota's a licensing company and receives licensing revenue as profits, that's actual loss. And so the difference here is very important in actual loss of royalty, because there are two different standards. So for actual loss, Cota has to prove with a reasonable certainty that sales would have been made in the future but for misappropriation, and that's very hard to do. And so for reasonable royalty, what it specifically says is that it doesn't matter. You don't look at the ultimate commercial success of the venture. So the cases are very clear about that. The standard jury instruction says that, which is based on the controlling Sixth Circuit cases. It says, a royalty is a license to use the trade secret and measure the value of the trade secret to the defendant at the time of misappropriation, regardless of the commercial success of the enterprise. Counsel, you're well into your rebuttal time. You can continue or save it. I think I'll just make one last point, Your Honor. Fine. This is what Mr. Robel called the flap tube. It's in Figure 2B. Then the same thing is the lug boss in Figure 2C. And so when Mr. Robel says, when he's talking about what's disclosed in his patent, and he says, well, the lug boss is on the rim. The flap tube is on the rim, and that's where the peristaltic pump is. It's on the rim. It's not above the rim, right? And the peristaltic pump is up here. And Goodyear recognized that distinction. Goodyear told the DOE, Department of Energy, and this is on page 27 of our brief, when they asked for millions of dollars to fund their self-inflating tire development. Goodyear said that we have a new invention. It's an innovative pump invention. It doesn't rely on the rim. It's above the rim. And the prior art out there, COTA, he said EG COTA is between the tire and the rim. That was talking about the 2007 PCT. That's how Mr. Robel explained it. At trial, the jury was entitled to credit that distinction. Thank you, Your Honor. I'd like to reserve the rest for the public. We will save it for you. Mr. Custanius. Thank you, Your Honor. Good morning, Your Honors, and may it please the court. I'd like to, I think, start with the questions that Judge Dyke asked my friend. In this Ohio trade secret case, there's an unusual aspect of this case that my friend didn't point out. And that is that the alleged trade secrets here were conveyed entirely orally. And that's important here, because that was the motivation of the judge for making her pretrial orders requiring the closed list. The allegation was that a two one-to-two-hour meetings taking place in Europe in 2009, Mr. Robel, despite his profligate, that's the term we used in our brief, they don't like it, but that's the term that we used, disclosure in patents, in award-winning articles, in PowerPoint presentations, in a website that showed his prototype. He displayed all of his self-inflating tired technology to the world. Those aren't secrets. What happened here? What happened is that he showed Goodyear what he had, which was public, at those meetings, and then when a patent case did not materialize for him, an investment banker came up with the idea of suing Goodyear for trade secret misappropriation. It's important to keep in mind also that the facts of this case show that when Goodyear's patent issued, the one that brings this court's jurisdiction into play, Mr. Robel didn't say, my god, they've stolen my secrets. He didn't say that at all. What he said was, this is my patent. This is what I've told the world about. So Judge Leoy, quite properly in this case, issued orders starting in 2019 requiring these closed lists. You're not going to get to morph your trade secrets, to mold them to what you need. Okay, but they're saying that even accepting that the interrogatory answers define the trade secrets, starting with trade secret 24, they say that the patent application and these other public statements didn't disclose a pump as described as trade secret 24 in the interrogatory. They say that didn't disclose a pump above the rim. I think that's their theory. Well, that is what you heard this morning, and that's what Judge Leoy heard. But they give up the game in their reply brief at page 8 when they say, well, trade secrets aren't like patent claims. We don't have to be held to the language of the patent claims. Of course, they do have to be held to the language of the trade secrets that they articulated here. And take a look at what Mr. Robel said. Okay, so why is it that there was public disclosure of the trade secret defined in the interrogatory for trade secret 24? So let's take a look, and I think, Judge Dyke, you were exactly right to point out that they have a challenge as an abuse of discretion, the court's pretrial ruling saying you have to have a closed list. So let's take a look at what that language is of trade secret 24. And if there is any definition here at all, it has to come from the language after namely. In the sidewall close to and above... Are you on the record? I'm sorry? You're reading something to us. Can you give us the definition? Well, you can see it at pages appendix 15 to 19 in the judge's post-trial ruling, but this is just the language that they picked for trade secret 24 that I'm reading to you. Namely, in the sidewall close to and above the rim where the tile tire, excuse me, cyclically deforms in response to deformation. Now, Mr. Robel at trial was asked if, and I'm quoting here from appendix 15757. This is very important. He said that locating a peristaltic pump in the tire sidewall near the rim in an area where it cyclically deforms was not a trade secret. If that's a definite secret, that's the end of the game. And I want to point out, Judge Dyke, in particular in response to your questions, my friend held up parts of his brief, pictures, other things. He talked about a Department of Energy report. Those aren't in trade secret 24. This is the game that we played at trial. Volume three... Okay, but it would be helpful if you showed us where in the application or where in the article this trade secret 24 is described and the interrogatory is disclosed. Because if I understand what they're saying, they're saying it doesn't disclose the peristaltic pump above the rim. So you can see this, and I'm going to grab my appendix volume here for a second. My partner also reminds me that pages 7 to 15 of our brief, we go through all of the disclosures as well as the admissions. But what the judge cited also contains the summary that we put in front of her in the district court, which is at pages 18056 to 18060. And you will see starting at 056, we summarize the PCT publication. And we point out here that in figure 3H, it shows the circular chamber 1 created in the ancillary structure 6. And it goes on to say, it is possible. This is the first bullet that's on 18056. It says, it is possible to create the chamber 1 with the extended surfaces 10 in the tire 4 sidewall. Can you also give us the actual citation to the underlying PCT publication itself so we can compare it to the summary? Sure. So the PCT starts at 252. It's in volume 1 of the joint appendix. And so what we're looking at there, we were starting by looking at page 17 of the PCT, which is appendix 270. Then you go over to page 18, which is appendix 271. And here's the operative language. The first paragraph at the top, it carries over. Also, the chamber 1 of the examples is placed mainly to the tire 4 bead. It can also be created, while keeping the considerable portion of the design advantages, anywhere else in the wall or at the wall of the tire. Then you go down to the bottom of that page. In the bottom paragraph that begins at 27, the chamber 1 can be created in the ancillary structure 6 or directly in the tire 4 wall, namely either between the layers of the commonly produced tire 4, or if there is not enough space in the tire 4 wall, it can be created in the lug boss on the tire 4 wall. The lug boss, by the way, is sort of an artificial thickening that's needed sometimes if the thickness of the tire is not enough. So there you're seeing that he's saying to the world in 2007 that it can be placed anywhere. On top of that, with regard to the location of the lug boss, he says at trial, it is part of the trial tire sidewall. Question by my partner, the lug boss is in the tire sidewall? Answer, the lug boss is part of the tire sidewall. And I said, he also testified... Well, how about above the rim? I mean, looking at your brief, page 8, and, for example, looking at their brief, page 24, does this figure with the red circle, does that show above the rim? Yes. Is that the theory? Yes, because the light gray part, I assume, yeah, you said it's a red circle, so you've got a colorized version. So the light gray part is the rim, and what you see there in what looks sort of like a... I don't even know how to describe that. It's sort of a slot, a groove. There was some debate at trial whether a slot and a groove are the same thing, but the thing that's circled there in the darker gray is above the rim, because you can see gray in between the light gray and the opening. So it is above the rim, but close, too. Exactly the language of Trade Secrets 24. And I just wanted to add on that point that at page 15795, Mr. Robel testified that the lug boss is on the rim, near and above the rim. So this is... Whose testimony was that? I'm sorry? Whose testimony was that? That was Mr. Robel, and that's cited at page 11 of our brief. Okay, and he's... who's he? That's the principal of CODA.  The inventor, one of the plaintiffs. So what we have here, as we saw at trial, was a lot of morphing, to use the term that Judge Loy used with my friend on the other side, a lot of morphing of the trade secret, a lot of adding things. Trade Secret 24, as, Judge Dyke, I think you recognized, doesn't really have definiteness unless you add the things that they want, which are a conventional sidewall or avoiding rim crush. Those are the things that weren't in there, but they became important at the J-Mall arguments, which, by the way, take up most of Volume 3 of the appendix here. Seven and a half hours, by the way, of Rule 50A arguments took place at trial. This judge did not flippantly grant Rule 50B judgment as a matter of law. She threw out some of the trade secrets at 50A, reserved on the definiteness of the rest, let the jury go forward, but ultimately said, I'm going to revisit definiteness after the verdict if I have to. And she did. What about damages? Your opposing counsel said there was a lot of use of what they claimed to be trade secrets. So... And they were deprived of licensing revenue. Well, of course, it bears note that the trade secret judgment is affirmed. We don't get here, but there was some talk about a pretrial interrogatory disclosing their theory. This is what they said. And this is... I don't know if this is in the appendix or not, but it's docket 223-20, page 197. This is what they said. The theories upon which these and other damages are based and the amounts of such damages will be calculated, supported, and substantiated by and through CODA's expert witnesses consistent with the court's discovery schedule. Now, Judge Cunningham, you asked my friend about royalty versus reasonable royalty. It is true that Ms. Webster, their damages expert, used a royalty theory, but she insisted that was not a reasonable royalty or a hypothetical negotiation. That was an actual damages theory. In fact, my friend expressed some frustration in a pretrial conference that Ms. Webster would not give him a reasonable royalty... give him reasonable royalty testimony. And just to be clear, Judge Lurie, their actual damages theory was based on speculation, on top of speculation, on top of speculation. The first part of that speculation was we would be able to turn these trade secrets into patents. That was asserted, but it was never proved. And given the prior art in this case, it's a really doubtful proposition. And the reason, by the way, that was important is that once a single tire is manufactured, it's reversed engineered, there's no more trade secret. It has no value. They then had an actual damages theory that required further speculation, which was that we would pay for an exclusive license, but then, strangely enough, we would go make more revenue by sublicensing that exclusive license to competitive tire manufacturers. Did they file patent applications? I'm sorry? Did they file patent applications? Did they file further patent applications? No. He had them 2007, 2009, and he had other patent applications, but they never showed that they could get patent applications on these trade secrets. That's the point of all of this. And one other thing with regard to this argument about the in lieu of language of the statute, that they told the court repeatedly that their royalty theory, and I can give you a citation for this, Appendix 18958, was that their theory was that their actual damages theory and their reasonable royalty theory were the same. So I don't understand what the prejudice is here for not allowing an instruction on a theory that their expert said she wasn't pursuing, given that they said pre-trial, but they were the same theory. Once the court has further questions, I'm happy to rest on our brief at this point. Thank you, counsel. Mr. Kern has about a minute and a half. I'd like to direct the court to Appendix 16802. This is a brief that Goodyear filed on 50A. It says, The most straightforward and fundamental reason JMAW should be granted here is CODA has not put on an actual loss case. Instead, it has presented a royalty theory. So Goodyear itself argued that we presented a royalty theory. But couldn't counsel just seem to be distinguishing between a royalty theory and a reasonable royalty theory? That was the distinction I heard drawn. How do you respond to that? There's no difference. It is a reasonable royalty. It was a Georgia-Pacific factor analysis that we presented. And so on this issue of the 2007 PCT, I think there was discussion of page A. Mr. Proble testified about this repeatedly. He said this is on the rim, and he explained, just like we just looked at, this is his invention to make a new tire that has additional rubber here on the rim. And so when the tire deforms, that's closed by the rim. His trade secret is above the rim. It's up here. That is testified about repeatedly. But doesn't that figure show that the pump is above the rim? I mean, on page 8 of the red brief? No, Your Honor. What Mr. Proble repeatedly said, that the pump goes in between the tire and the rim, and it sits on the rim. And then after saying that maybe seven or eight times in a row, what Mr. Proble said is, okay, anything that sits on something is actually above it. I'm trying to work from the definition of the trade secret that you provided interrogatory. And there's lots of evidence that there was public disclosure of that alleged trade secret. What is it you're saying wasn't publicly disclosed? So what is not publicly disclosed is the optimal location for a tire producer for a pump that is close to but above the rim and in the sidewall. And Mr. Proble differed his 2007 PCT because that's a pump that goes in between the sidewall and the tire. And when he said, can it be part of the sidewall? He says yes, but only in the sense that- Just to make sure in terms of how you're answering Judge Banks' question, are you just responding with respect to what was not disclosed with respect to the 2007 PCT application? Or are you also responding in terms of the other public disclosures that opposing counsel points to in terms of articles and the like? All of them. So the tire tech article was just an article discussing the invention of the 2007 PCT. Okay, but what's missing? I'm not understanding. What is it that's a trade secret that wasn't publicly disclosed in the application or the article? What feature was missing? So this is the tire in the sidewall, and this is the rim. Here is where the code of trade secret is. It goes in the sidewall above the rim. The 2007 PCT said, make this additional piece, put it in between the tire and the rim, and put the tube there. That's what Mr. Fraubel testified. Are you saying the code of trade secret is what is in the red circle on page 8 of the red brief? No, Your Honor. What's in the red circle on page 8? That is Mr. Fraubel's 2007 PCT invention. You'll notice there's a triangle there in between. Okay, so why doesn't that satisfy the interrogatory, the red circle and that figure? Because that is not in the sidewall above the rim. That sort of corner, this corner, that is something that Mr. Fraubel's 2007 PCT adds to a normal tire sidewall. And so it's not in the sidewall. Look. Well, I appreciate that you are drawing a figure for us here live on the fly, but what would be helpful to us so that we can actually have it to take back with us is if you could point to somewhere in the record to show us that.  So Mr. Fraubel testified and explained this distinction. Where does he testify that the figure on page 8 doesn't disclose his trade secret? He testifies at 15496 through 15498. Okay, that's a pretty big span. Where exactly does he testify to this? I'm sorry, 15493 through 94. He explains how his flap solution is different. 1593? Yes, Your Honor. 1593 through 1594. I thought you said 15493. How many days? I'm sorry. I'm sorry. 15493 through 15494. And also, Your Honor, I think on 15493. No, no, no, no, no. Don't just throw numbers at us. Show us where he testifies that this figure on page 8 of the red brief doesn't disclose his trade secret. So at 15498, Mr. Fraubel testifies. Okay, wait a second. 15498, okay. Okay. He testifies. The 2007 PCT does not disclose trade secret 24. I don't see him on 15498 giving a testimony that you seem to think he gave. So at line 7, the question is, Mr. Fraubel, does your 2007 PCT disclose the tube in the groove trade secret in the location that is close to and above the rim that you've been describing? So that refers to his earlier testimony. He says no, it doesn't. That's not what's shown on page 8 of the red brief. It's talking about the tire technology article. Where does he say that doesn't disclose the trade secret? Your Honor, what is in the tire technology article is the exact same disclosure in the 2007 PCT. The tire technology article is about the flap tube invention and the lug boss. Those are the same things that are in the 2007 PCT. They're identical. Do you have any testimony to point us to to acquaint the 2007 PCT application to the tire technology article? Counsel, your time is well expired if you don't have a ready answer to the Judge Conahan's question. So, Your Honor, I would point the court to, and I know I'm out of time, so I'll just give you one last range. After the cross, we came back on redirect and at 15949 through 959. I recognize that's 10 pages, but Mr. Hrabel there goes through and he talks about the lug boss and the flap. And if you look at the 2007 PCT, that's what is discussed there. And the tire tech article is also the lug boss and the flap. If you look on the face of them, they're one and the same. I'd be happy to find that site and provide a 28-J on the site. Thank you to both counsel. The case is submitted.